---

GLENDALE STEWART,

                Plaintiff,             OPINION AND ORDER

    v.

                                       09-cv-554-slc

CAPITAL NEWSPAPERS, INC.,

                Defendant.

---

Plaintiff Glendale Stewart, who is proceeding *pro se*, brings this Title VII action against his former employer, Capital Newspapers, Inc. Stewart, who is African American, contends that Capital Newspapers: 1) subjected him to a hostile work environment because of his race and color; 2) failed to promote him, suspended him and fired him because of his race and color; and 3) suspended him and fired him because he filed a discrimination complaint with the Madison Equal Opportunities Division. The parties have filed cross-motions for summary judgment. Dkts. 43 and 50. Also before the court is Capital Newspapers's motion to strike Stewart's amended proposed findings of fact and alternative motion for an extension of time to file a response to those proposed facts. Dkt. 69.

Because Stewart has failed to adduce sufficient evidence from which a reasonable jury could find that he was harassed, failed to receive a promotion or terminated because of his race his complaint of race discrimination, I am granting Capital Newspapers's motion for summary judgment. I am denying as unnecessary Capital Newspapers's motion to strike Stewart's amended facts.

Before setting out the facts, the court must address a few preliminary matters:

Copy of this document has been
provided to PHD
this 23 day of NOV, 2010
by CALVIN
C. A. Korth, Secretary to
Magistrate Judge Crocker

## I.  Stewart's Failure to Follow The Court's Summary Judgment Procedure

On July 16, 2010, Stewart filed a 174-page document entitled "Motion for Summary Judgment" (dkt. 43), in which he punctiliously presents over 600 typed paragraphs of unsupported factual assertions about the alleged discrimination he experienced while employed at Capital Newspapers and the Madison Veterans Hospital (which is not a defendant in this lawsuit).  In conjunction with this motion, plaintiff filed a "Brief in Support of Motion for Summary Judgment" (dkt. 44)(a 4½ page letter explaining plaintiff's difficulties litigating his case); 27 proposed findings of fact (dkt. 45); and over 50 exhibits (dkts. 46 and 49).  On September 1, 2010, after Capital Newspapers moved for summary judgment, Stewart filed an opposition brief (dkt. 63), a response to Capital Newspapers's proposed findings of fact (dkt. 65), a document entitled "Amended Proposed Findings of Fact" (dkt. 64) and numerous other exhibits, including his sworn affidavit (dkt. 67).  Attached as Exhibit A to the affidavit is a 34-page, 131 paragraph document titled "Additional Statements in Support of Plaintiff's Claims."

Following the preliminary pretrial conference, the court provided the parties with clear instructions about how to propose findings of fact to support or oppose a motion for summary judgment.  *See* attachments to Pretrial Conf. Ord., dkt. 15.  As these documents explain, "[t]he court will not search the record for factual evidence.  Even if there is evidence in the record to support your position on summary judgment, if you do not propose a finding of fact with proper citation, the court will not consider that evidence when deciding the motion."  *Helpful Tips for Filing A Summary Judgment Motion,* dkt. 15, at 12.  Further, the court "will not consider facts contained only in a brief."  *Procedure to Be Followed on Motions For Summary Judgment,* dkt. 15, at

14. As discussed further below, Stewart failed to comply with these procedural rules in most instances.

Because Stewart is proceeding *pro se*, the court took steps to help him understand how to follow this court's procedures. Also attached to the Preliminary Pretrial Conference Order was a *Memorandum to Pro Se Litigants Regarding Summary Judgment Motions*, the purpose of which was to ensure that *pro se* parties receive a "fair shake" in litigating their cases before this court. *E.g., Dale v. Poston*, 548 F.3d 563, 568 (7th Cir. 2008) (district court's decision to ignore *pro se* plaintiff's filed documents because they were argumentative and lacked detail raised question whether plaintiff had been given a "fair shake"). Nonetheless, while a *pro se* litigant receives some leeway in following procedural rules and requirements, he is not free to ignore court rules. *Id.*; *Hoeft v. Clark*, 2010 WL 1373462, at *1 (W.D. Wis. Mar. 30, 2010). "Given the often daunting nature of motions for summary judgment," the Court of Appeals for the Seventh Circuit has emphasized the importance of local rules and "has consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules," even in *pro se* cases. *Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) (citations omitted). Therefore, in setting out the facts below, I have accepted as true only those facts that are properly proposed, material to Stewart's claim and supported by admissible evidence.

That said, very few of Stewart's proposed findings of fact are relevant or supported by admissible evidence. For example, plaintiff proposes several facts related to his "case with Madison Veteran Memorial Hospital" and his alleged misrepresentation by his former lawyer. *See* dkt. 45, ¶¶ 2, 21-23; dkt. 64, ¶¶ 3-4, 56-66. None of this relate to the claims on which this court granted Stewart leave to proceed. Stewart also proposes as fact conclusory statements,

3

such as "[Stewart] was not promoted or given good pay increases while other employees who received degrees and or certificates were." Dkt. 45, ¶ 6.  However, he fails to cite his affidavit, deposition testimony or other admissible evidence to support these statements.  Stewart attempts to set forth his version of events in his "Additional Statements in Support of Plaintiff's Claim."  However, he only cites this document on a few occasions in response to Capital Newspapers's proposed findings of fact.  Stewart does not propose these "statements" as fact in support of his summary judgment motion or his opposition to Capital Newspapers's motion.  To the extent that factual information supportive of Stewart's claims may be lurking in this document or one of the other exhibits that he filed, it is not the court's or defendant's obligation to "scour the record" in search of it. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).[1]

Finally, I note that Stewart relied heavily on the audio recording of his July 2007 unemployment compensation hearing to support his version of the incidents leading up to his termination.  Although it is questionable whether such evidence is admissible for the truth of the matter asserted, *see* Fed. R. Ev. 801, I will presume that Stewart is citing to his testimony in lieu of filing a separate affidavit.  Capital Newspapers is correct that Stewart technically has not followed the court's summary judgment procedures in citing to such evidence, but I will give Stewart the benefit of the doubt and permit him to support otherwise relevant facts with this evidence.  This leads to another problem: Stewart cites generally, rather than specifically, to the audio recording, making it extremely difficult for the court or Capital Newspapers to verify

---

[1] Even though it is not the court's job to scour the exhibits filed by Stewart, a brief review of them establishes that most do not provide evidentiary support for Stewart's claims because they are irrelevant, inadmissible for the truth of the matter asserted or do not support the inference Stewart claims.

whether the recording of the hearing actually supports the facts for which Stewart is citing it. In the end, it doesn't matter: even if this court accepts Stewart's proposed findings of fact that he bases on the audio recording, Stewart fails to meet his burden. Therefore, I have included those proposed facts in my recitation of the undisputed facts further down in this order.

## II. Motion to Strike

Capital Newspapers has moved to strike Stewart's amended proposed findings of fact on the ground that he submitted them nearly a month after the summary judgment deadline expired. Dkt. 69. However, under the court's summary judgment procedures, Stewart may propose his own supplemental facts in support of his response to a motion for summary judgment. *See Procedure to Be Followed on Motions For Summary Judgment*, section II.B., attached to Pretrial Conf. Ord., dkt. 15, at 15-16. Despite the misleading caption, I will consider Stewart's "Amended Proposed Findings of Fact" as proposed *supplemental* findings of fact and not as an attempt to amend the facts proposed in support of his own, earlier-filed motion for summary judgment. Accordingly, the motion to strike will be denied. In the alternative, Capital Newspapers requested that it be granted 30 days to respond to Stewart's supplemental facts. I am denying this request as unnecessary because even accepting as true those of Stewart's supplemental facts that are properly supported, Stewart's claims do not survive summary judgment.

From the parties' submissions, and pursuant to the accommodations explained above, I find the following facts to be undisputed and material for the purposes of deciding the motions for summary judgment:

## UNDISPUTED FACTS

Plaintiff Glendale Stewart, who is African American, is a resident of Madison, Wisconsin. In 2005, he earned an associates degree in applied sciences and electronics technology. Defendant Madison Newspapers, Inc., which does business as "Capital Newspapers," is a Wisconsin corporation that runs and operates a number of newspapers throughout the State of Wisconsin.

In January 1997, Capital Newspapers hired Stewart as an electrical mechanic technician. Stewart was qualified for the position at the time of his hire. As part his orientation as a new hire, Stewart was provided with various documents, including a copy of Capital Newspapers's employee handbook. The section of the handbook entitled "respectful workplace policies and procedures" sets forth specific rules of conduct, stating that certain situations "will require disciplinary action, up to and including discharge," including leaving work without permission, insubordination and "failure to adhere to conduct that Capital Newspapers had a right to expect of its employees." The handbook also includes an anti-harassment policy that sets forth the following complaint procedure:

> If you believe that you have experienced any job-related harassment by a manager, supervisor, co-worker, customer, client, independent contractor, or vendor, you should promptly take one or all of the following steps (1) politely but firmly confront the person harassing you. State your feelings about the actions and request that the person cease the harassment. (2) Talk to your supervisor, manager, department head, human resources director, vice president, editor or publisher, depending on with whom you feel most comfortable. (3) Discuss the problem with the human resources director if you believe that inadequate action is being taken to resolve the complaint after a reasonable length of time. If the harassment is not eliminated, you are entitled to file a complaint with an external enforcement agency.

Capital Newspapers does not have a progressive discipline policy.

In March 2007, Stewart complained to human resources about a disagreement he had with a co-worker, Kurt Ziegler, after the Super Bowl. He reported that Ziegler said that "if black people don't like being called Americans rather than African Americans then they should go back to Africa where they come from." Human resources investigated the allegations by interviewing Stewart's supervisor, Al Chase, and Ziegler.[2] (The parties dispute whether Stewart cooperated in the investigation.) On March 16, Rebecca Weigel, a human resources employment specialist, and Jerry Simpkins, Stewart's department manager, met with Stewart to discuss Ziegler's comment and Stewart's concerns about black jokes and farting incidents that had occurred in 2006. Stewart did not provide any details about the alleged black jokes.[3] He also made it clear that he would not use Capital Newspapers's internal procedures to address his racial harassment complaints.

Capital Newspapers concluded that Stewart and Ziegler had a disagreement and that Ziegler's comments were not directed at Stewart but were rather limited to their discussion about social and political perceptions of African Americans. Ziegler was not disciplined. Stewart never complained to human resources about any other racial comments or jokes in the workplace.

Stewart filed a complaint of racial harassment with the Madison Equal Opportunities Division (MEOD) on March 20, 2007. In the complaint, he listed three incidents: (1) co-

---

[2] Stewart points out that at some point during this period, Ziegler was on medical leave and unavailable for an interview. However, he does not refute the fact that Ziegler eventually was interviewed.

[3] Stewart asserts that he did not provide these details because neither Weigel or Simpkins had been working at Capital Newspapers when the alleged jokes occurred. However, he offers no evidence to support this assertion and he fails to explain why this would have mattered. Further, it is undisputed that Weigel worked for Capital Newspapers from June 2004 to March 2009, which covers the period when Stewart alleges that at least some of the harassment took place.

workers acting disrespectfully by passing gas around him in 2006;[4] (2) Ziegler's 2007 statement; and (3) unspecified racial slurs and jokes that had been directed toward him in 1998. (Stewart alleges without support that he had other concerns at the time but admits that they were not included in the complaint). Capital Newspapers became aware of this complaint during the week of March 28, 2007.

At his deposition, Stewart testified that the harassment he experienced included these incidents: (1) a co-worker referencing a rope while he and Stewart were fixing a conveyor belt (this incident allegedly occurred in front of Chase); (2) Chase stating that Stewart was "used to that kind of stuff" in reference to dealing with an irate customer in 2005; and (3) being disciplined by Chase in 2004 for telling a female co-worker that she had "nice jeans." Stewart had not made any formal complaints to Chase about these incidents. Capital Newspapers has no documentation relating to any investigation performed as a result of the racial harassment that Stewart allegedly received at the hands of his co-workers.

On May 23, 2007, Stewart had an argument with a co-worker, Don Kelleher, in the press shop. Stewart and Kelleher both used profanity during the incident. Stewart heard other employees and the department manager use profanity on a regular basis. For example, the department manager told Stewart it was "none of your damned business what was going on in the mailroom" when Stewart asked about a gun threat that had recently occurred there. Two days after the argument, on May 25, Chase told Stewart to attend a meeting with him, Simpkins

---

[4] Although Capital Newspapers correctly points out that Stewart testified at his deposition that this incident occurred in 2005, Stewart explains in unsworn testimony that he was mistaken and that this incident occurred in 2006. A review of the MEOD complaint shows that Stewart identified the incidents as occurring in 2006 and 2007, so I have accepted 2006 as the year that this incident occurred.

and Weigel. During the meeting, Stewart was asked about using profanity on May 23. (The parties dispute whether Stewart refused to cooperate in the investigatory meeting).

When the meeting ended, Stewart asked to leave work for the day. Chase asked Stewart whether he had completed his work and Stewart stated that he had not. At some point, Chase followed after Stewart yelling "Have I ever done anything to you?" and slammed a door. Soon after, Stewart left work without permission because he felt demoralized and wanted to avoid a physical altercation with Chase.

The following week, Capital Newspapers's Human Resources Director, Debra Reed, contacted Stewart and asked him to report to work to discuss the altercation with Kelleher and the subsequent dispute with Chase. Stewart did not do so.

On May 30, 2007, Capital Newspapers terminated Stewart, telling him that it was because he had refused to report to work to discuss misconduct that he was accused of committing on May 23 (using profanity) and May 25 (leaving work without permission and not following instructions). Simpkins set forth Capital Newspapers's reasons for Stewart's termination in a letter to Stewart dated May 30, 2007.

No African Americans were involved in the decision to terminate Stewart. Capital Newspapers did not provide Stewart with any documents warning him that his job was in danger or indicating that he had received a warning or been placed on paid suspension. Although Kelleher initiated the use of profanity on May 23, he at most received a reprimand.[5] Stewart does not know if Kelleher left work without permission or refused to cooperate in the profanity

_____

[5] Stewart points to various statements from Capital Newspapers employees showing there is some confusion about what sort of reprimand, if any, Kelleher received. However, the exact nature of the reprimand is not material to Stewart's discrimination claim because the relevant inference is that Kelleher was disciplined less severely than Stewart.

9

investigation. Chase was given a written warning for his conduct toward Stewart on May 25. Soon after these incidents, on May 31, 2007, Stewart filed another complaint with MEOD, alleging that he was terminated because of his race and in retaliation for filing the earlier MEOD complaint.

At some point between January 1, 2000 and December 31, 2009, Capital Newspapers employed 826 full-time white employees. During that same period, it employed a total of 36 black employees. In response to Stewart's request for admission about the ratio of African American to Caucasian employees over the past 20 years, Capital Newspapers responded that there was 1 African American for every 4.25 white employees. A spreadsheet entitled "Building Services Employee Data January 1, 2006 to May 30, 2008" shows that Stewart and 12 Caucasian employees worked in various positions for Capital Newspapers during this period. Stewart is listed as the only African American employee. None of the other 12 employees were disciplined or terminated but 6 were laid off.

Stewart did not allege that he was denied a promotion or a raise in either of his MEOD complaints. After Stewart got his associates degree in 2005, Capital Newspapers did not promote him. Capital Newspapers gave him a 2.5% raise in 2005 and a 2% raise in 2006. Capital Newspapers told Stewart that something would be done about his lack of additional pay increases but it never did anything about the complaints that he made. In April 2007, Stewart complained to Reed about not receiving a raise or promotion after receiving his degree in 2005. Reed told Stewart that it was not Capital Newspapers's policy to give raises when an employee receives a degree. In fact, Reed did not get a raise or promotion after she received her BA degree. (The parties dispute whether Stewart used the "satisfaction system" to air his concerns.)

The MEOD issued a finding of no probable cause on March 7, 2008 and an administrative law judge affirmed that decision on February 9, 2009.

## OPINION

### I. Legal Framework

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Summary judgment is appropriate if there are no genuinely disputed material facts, and if on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The applicable substantive law will dictate which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).

In this civil lawsuit, Stewart, as the plaintiff, has the burden to prove his claim. Stewart must show what evidence he has that would convince a trier of fact to accept his version of the events. *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). Even so, in deciding Capital Newspapers's motion for summary judgment, this court must view all facts and draw all inferences in the light most favorable to Stewart because he is the non-moving party. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). But Stewart may not simply rest on the allegations in his complaint; rather, he must come respond by presenting

specific facts that would support a jury's verdict in his favor on his claims. *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005). If Stewart fails to make a sufficient showing on an essential element of his case where he has the burden of proof, then this court must grant summary judgment to Capital Newspapers. *Celotex*, 477 U.S. at 323.

Stewart's claims arise under Title VII, 42 U.S.C. § 2000e-2(a), which makes it unlawful for an employer to deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of his race, color, religion, sex or national origin. Stewart can establish race discrimination under Title VII by using either the direct method or indirect method of proof. *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009).

To survive summary judgment using the direct method, Stewart must present direct or circumstantial evidence that creates "triable issues as to whether discrimination motivated the adverse employment action." *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 631 (7th Cir. 2009) (quotation omitted). Direct evidence includes an admission by the decisionmaker that it was motivated by discriminatory animus. *Id.* (citation omitted). Such admissions are understandably rare, and not present in this case. Therefore, plaintiffs more often rely on circumstantial evidence of discrimination, which tends to fall within one of the following categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over

in favor of a person outside the protected class and the employer's
reason is a pretext for discrimination.

*Id.* (citing *Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007); *See also Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)).

Under the indirect method, Stewart first must establish "a prima facie case of discrimination by presenting evidence that: (1) [he] is a member of a protected class, (2) [his] job performance was meeting [his] employer's legitimate expectations, (3) [he] was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably." *Winsley*, 563 F.3d at 604 (citation omitted). A valid prima facie case creates a presumption that discrimination has occurred by eliminating the most common nondiscriminatory reasons for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

If Stewart meets this burden, then the burden shifts to Capital Newspapers to rebut the presumption by coming forth with a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If that happens, the initial presumption of discrimination drops from the case and the burden shifts back to Stewart to show that Capital Newspapers's proffered reason is a pretext, that is, "not the true reason" for the employment decision. *Id.* at 255.

As discussed with respect to each of Stewart's allegations below, Stewart has failed to provide sufficient evidence under either method from which a reasonable jury could find in his favor. As a result, Stewart has failed to satisfy his summary judgment burden "to come forward with the evidence that [he] has-it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 766 (7th Cir. 2009) (internal quotation omitted).

13

## II. Harassment

Stewart generally alleges that he was subject to continuous racial harassment about which his supervisors did nothing. However, in his March 20, 2007 MEOD complaint and his federal court complaint (dkt. 10), Stewart identifies only three specific incidents: (1) a co-worker's 1998 comment about using a rope; (2) co-workers intentionally farting around him in 2006; and (3) Ziegler's 2007 statement that black people "should go back to Africa." In his later deposition testimony and summary judgment response brief, Stewart has referenced other incidents of harassment, including black jokes and racial taunts made by co-workers, statements by his supervisor that he should be "used to" dealing with irritable people and being disciplined for "nonsense" reasons, such as telling a female co-worker that she had "nice jeans." Capital Newspapers challenges Stewart's claim on both procedural and substantive grounds.

### A. Procedural Concerns

Title VII includes various procedural requirements that a plaintiff must satisfy before filing a lawsuit in federal court. One such rule is that "a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. Western and Southern Life Insurance, Co.*, 31 F.3d 497, 500 (7th Cir. 1994). However, courts recognize that because non-lawyers typically file charges with the EEOC, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.* Thus, in determining whether a claim in a lawsuit was included in an EEOC charge, courts use the liberal standard that "Title VII plaintiffs may also litigate claims which are 'like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations.'"

*Teal v. Potter*, 559 F.3d 687, 691-92 (7th Cir. 2009) (quoting *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (citation omitted)).

Although I agree with Capital Newspapers that the factual basis for Stewart's harassment claim is a moving target to which Stewart seems to add new allegations with each new filing, nonetheless I will give Stewart the benefit of the doubt and allow him to complain about incidents of racial harassment that he did not raise in his MEOD complaint because they can be viewed as reasonably related to that complaint. However, consistent with my position that Stewart has to follow the court's summary judgment procedure, I will not consider allegations appearing only in his brief or deposition testimony unless Stewart also made the allegation a proposed finding of fact.

Another important Title VII requirement is that a plaintiff must file a discrimination charge within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 921 (7th Cir. 2007). Capital Newspapers contends that all but the 2007 incident are time barred because they occurred more than 300 days before Stewart filed his MEOD charge on March 20, 2007.[6] In response, Stewart argues that the older incidents of racial harassment were part of an overall pattern that continued through his termination in 2007. That's a legitimate argument.

Under the "continuing violation doctrine," if a Title VII plaintiff is able to place one incident within the limitations period, he may "sweep in" other incidents that are more than 300

---

[6] As noted above, it is unclear from the undisputed facts exactly when the farting incident occurred. Stewart asserts in his brief that the incident occurred in April and May 2006. Accepting this time frame, at least a portion of this incident falls within the 300-day time period, which in this case began in mid-May 2006.

days old if they are part of the same "unlawful practice." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). The rationale is that a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing 42 U.S.C. § 2000e-5(e)(1)). Because the "unlawful employment practice" continues through the last act of harassment, older incidents may be deemed timely as part the same "practice" as the newer incidents.

Although Stewart's bare bones allegations make it impossible to tell what actually took place while he was working at Capital Newspapers, he does indicate that all of these incidents involved racial slurs or jokes that occurred while he was working in the same department under the same supervisors. *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) ("As long as the employee remains within a single chain of command, however, and the same people control how the employer addresses problems in the workplace, there is only one employment practice, and all events may be considered . . . to determine whether that employment practice violates Title VII."). Therefore, at least for the purpose of deciding the summary judgment motions, I will assume that all of the alleged incidents are part of the same unlawful employment practice. That said, Stewart still must establish a prima facie case of racial harassment involving at least one incident occurring within the statute of limitations period. He has failed to do so.

### B. Substantive Claim

To prevail on a harassment claim, Stewart must show that he was subjected to unwelcome conduct because of his race or color, that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and that Capital Newspapers failed to

respond in a reasonable manner. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Whether conduct is "severe or pervasive" is a context-sensitive question that can be answered "only by looking at all the circumstances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-23 (1993) (harassment not subject to "a mathematically precise test"). Isolated or one-time comments generally do not suffice, *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 732 (7th Cir. 2009), but "being repeatedly called a racist slur" may give rise to a claim. *Bannon v. University of Chicago*, 503 F.3d 623, 629 (7th Cir. 2007). *See also Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635-36 (7th Cir. 2009) (use of noose imagery may contribute to harassment because "[t]he noose is a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs").

Stewart has failed to identify with any specificity the harassing behavior that he was subjected to or the circumstances showing that the behavior occurred because he is African American. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722-23 (7th Cir. 2008). All we know about what occurred in 2007 is that Stewart had a disagreement with Ziegler after the Super Bowl in which Ziegler allegedly stated that "if black people don't like being called Americans rather than African Americans then they should go back to Africa where they come from." Although Ziegler's comment refers to race and Stewart is African American, it is impossible to determine from this limited information whether the statement was racially motivated harassment or merely part of the discussion Stewart and Ziegler were having about racial issues. Considered alone, a reasonable jury could not conclude that the comment constituted severe or pervasive harassment.

To be actionable under Title VII, racial harassment must be subjectively and objectively offensive. *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 912 (7th Cir. 2010). The harassment must be severe enough for a reasonable person to consider it hostile or abusive and the employee must perceive it as such. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004). Here, it is clear that Stewart considered Ziegler's comment to be harassment, but the Supreme Court has held that an isolated comment susceptible to more than one reasonable interpretation is wholly insufficient to create an objectively hostile work environment. *Faragher*, 524 U.S. at 787 (offhand comments and isolated comments or incidents, unless extremely serious, not actionable under Title VII). "The mere utterance of a racial epithet that engenders offensive feelings does not sufficiently affect the conditions of employment to create a hostile work environment." *Salvadori v. Franklin School Dist.*, 293 F.3d 989, 997 (7th Cir. 2002); *see also Reed v. Ewald Automotive Group*, 2010 WL 3418306, *11 (E.D. Wis. Aug. 26, 2010) (quoting *Faragher*, 524 U.S. at 786-87 for same and noting lack of racial sensitivity also insufficient basis of harassment claim)).

Although Stewart refers to continuous harassment in the form of "black jokes" or racial taunts, he fails sufficiently to identify any incident in his proposed findings of fact. The only other conduct that he mentions that may have occurred within the statute of limitations period is that co-workers intentionally passed gas in front of him. Offensive as this may have been, Stewart fails to describe how this behavior relates in any way to his race. Other than the fact that Stewart's co-workers are white, there are no facts from which a conclusion can be drawn that they were motivated by racial animus. Even considering the facts in a light most favorable

18

to Stewart, I conclude that he was not subjected to an abusive working environment based on the alleged isolated racial comments of certain individuals. *See Reed*, 2010 WL 3418306, *11.

Further, there is no basis for employer liability in this case. *Porter*, 576 F.3d at 636 (employer can avoid liability for coworker harassment "if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.") (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)). From the undisputed facts, it appears that Capital Newspapers responded to Stewart's limited complaints of harassment in a reasonable manner. Human resources investigated the Ziegler incident and later met with Stewart and his supervisors to discuss that incident and Stewart's other stated concerns about black jokes and farting incidents that had occurred in 2006. *See id.* at 637 (focus is not whether employer punished perpetrators but whether employer took reasonable steps to prevent future harm). Although there is a dispute whether Stewart participated in these discussions, he admits that he did not provide any details about the alleged black jokes and did not want to use any formal internal procedures to address his concerns. Without further cooperation from Stewart, it is unclear what else Capital Newspapers could have done to address Stewart's concerns.

III.    **Failure to Promote**

Stewart complains that he was not promoted or given a significant raise when he earned his associate's degree in 2005. Stewart did not raise this claim in either of his MEOD complaints. Stewart mentioned race discrimination only in the context of racial harassment by co-workers and his termination for complaining about that harassment. In contrast to racial harassment, his allegations of disparity in promotional opportunities and raises are not "like or

reasonably related" to racial slurs or his termination, which was premised on his misconduct vis-a-vis other employees and constitutes an entirely separate circumstance from not being promoted or given significant raises after receiving his degree in 2005. *E.g., Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110-11 (7th Cir. 1992) (EEOC charge and complaint not alike or reasonably related where employee complained to EEOC of only certain episodes of discrimination, and then sought judicial relief for different episodes). It would be illogical and unreasonable to surmise that the MEOD, while investigating Stewart's allegations of co-worker harassment and unfair termination, would have discovered this earlier, completely unrelated circumstance that Stewart did not bring to its attention. *Cheek*, 31 F.3d at 501 ("Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination."). Therefore, Stewart's alleged harassment at the hands of co-workers and his subsequent termination are separate and distinct acts from any failure to promote him.

For argument's sake, even if Stewart's failure to promote claim could be considered reasonably related to his other discrimination claims, there is a dearth of evidence surrounding that claim. Although Stewart claims that other white employees who received degrees or certificates were given promotions or "decent" raises, he has failed to adduce any evidence supporting this assertion. He refers only to Capital Newspapers's response to his interrogatories, in which it stated that during the past 5 years, "some employees may have received promotions after obtaining a certificate or degree in a given field. However, Defendant has not been able to identify any employee who was promoted because he or she received such a degree." A

20

reasonable jury could not infer from such a statement that Capital Newspapers treated Stewart differently from its white employees with respect to promotions.

## IV. Suspension and Termination

Stewart asserts that Capital Newspapers suspended and terminated him following an argument with a co-worker because of his race. In support of this claim, Stewart alleges that he was not given any advanced warning of the discipline, the other co-worker involved in the incident was not disciplined, and other employees who engaged in similar conduct were not disciplined. However, Stewart has failed to provide any evidentiary support for these allegations. It is undisputed that Stewart did not receive any advanced notice of his suspension or termination, but Capitol Newspapers was not required to give him any: the company does not have a progressive discipline policy and there is no evidence that it provided advance notice of discipline only to white employees. Although I understand that Stewart believes that Capital Newspapers should have used such a policy, he cannot prove his claim with his personal beliefs and opinions about how his employer could have treated him better. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).

Stewart also fails in his attempts to compare himself to other employees. To be similarly situated, the individual at least must have "'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the [decision maker's] treatment'" of him. *Snipes v. Illinois Department of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)); *see also Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (to meet burden, plaintiff must

demonstrate that individual is directly comparable in all material respects). Stewart has not made this showing.

Stewart fails to identify or provide any details about the white employees who he alleges were treated more favorably than him. Although in his response brief and various exhibits Stewart mentions a few employees who committed various forms of misconduct, he has failed to include such allegations in his proposed findings of fact. Further, none of the cited incidents are similar to the one in which he was involved, and it appears that Stewart merely is assuming that none of these employees were disciplined. *See* dkt. 68, at 32-33. The only incident that Stewart describes with any specificity is Capital Newspapers's treatment of Kelleher, the white employee involved in the May 2007 incident. Capital Newspapers's stated reason for terminating Stewart and not Kelleher is that in addition to using profanity, Stewart was insubordinate, left work without permission, failed to complete his work and refused to report to work when asked to do so.

There is no indication in the record before the court that this reason was pretext for racial discrimination. Pretext is more than just a mistake or a foolish decision; it is a lie covering up a true discriminatory or retaliatory motive. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). "[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Id.* at 417-18. Capital Newspapers stated that it did not discipline or fire Kelleher because Kelleher did not commit the same misconduct as Stewart. On its face and without evidence to the contrary, this reason is rational. As such, Stewart has failed to make out a claim of race discrimination.

## V. Retaliation

Under Title VII's anti-retaliation provision, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). "A plaintiff may prove retaliation by presenting direct evidence of 1) a statutorily protected activity, 2) an adverse action taken by the employer, and 3) a causal connection between the two." *Salas*, 493 F.3d at 924 (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). Circumstantial evidence of intentional retaliation includes "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* (citation omitted). "An indirect retaliation claim mirrors an indirect disparate treatment claim, except that the first prong requires evidence of protected activity under Title VII rather than proof of membership in a protected group." *Id.*

As evidence of retaliation, Stewart points to the suspicious timing of his termination—two months after his filing of an MEOD charge of discrimination—and to a bad reference Capital Newspapers allegedly gave to his prospective employer. But Stewart has failed properly to propose any facts supporting his allegation that Capital Newspapers gave him a bad reference. To the contrary, the facts that he proposed based on his deposition testimony state that he was told by an employee at Aerotek Commercial Staffing that Al Chase had *not* provided a bad reference and did not give a "negative vibe."[7]  Stewart Dep. Tr., dkt. 67, Exh. H at 164.

---

[7] This proposed fact was not accepted because it was based on hearsay evidence.

Although Stewart may use evidence of suspicious timing, *e.g., Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006); *Culver v. Gorman & Co.*, 416 F.3d 540, 545-50 (7th Cir. 2005), "[e]vidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim of retaliation," *Mobley v. Allstate Insurance Co.*, 531 F.3d 539, 549 (7th Cir. 2008). It would be sheer speculation to infer a retaliatory motive solely from the fact that Stewart was fired two months after filing an MEOD complaint. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second . . . Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."). As discussed above, Capital Newspapers has provided a reasonable explanation for terminating Stewart and there is no evidence that this explanation was a pretext for race discrimination or retaliation. Accordingly, Stewart also fails to state a claim of retaliation.

CONCLUSION

Stewart's submissions in support of his discrimination claims are lengthy and passionate, but they are untethered to the factual record and fatally vague. The court has cut Stewart more slack than usual in order to ensure a fair, appropriate analysis of his claims. Giving Stewart the benefit of the doubt does not change the outcome: he has not provided sufficient support for his allegations to obtain a trial, let alone to obtain summary judgment in his favor. To the contrary, Capital Newspapers has established that it is entitled to summary judgment on Stewart's claims.

ORDER

IT IS ORDERED that:

(1)    Plaintiff Glendale Stewart's motion for summary judgment (dkt. 43) is DENIED;

(2)    Defendant Capital Newspapers, Inc.'s motion for summary judgment (dkt. 50) is GRANTED;

(3)    Capital Newspapers's motion to strike and alternative motion for an extension of time (dkt. 69) is DENIED; and

(4)    The clerk of court is directed to close this case and enter judgment in favor of Capital Newspapers.

Entered this 23rd day of November , 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge